***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments of the parties. The appealing party has shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Therefore, the Full Commission reverses the opinion of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times herein.
3. Defendant-Employer was insured for workers' compensation by Cincinnati Insurance Company at all relevant times herein.
4. Plaintiff's average weekly wage entitled her to the maximum compensation rate of $560.00 in effect in 1999.
5. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit No. 1. A job analysis was stipulated into evidence as Stipulated Exhibit No. 2. A job video was stipulated into evidence as Stipulated Exhibit No. 3. The depositions of the following have been stipulated into evidence: (1) Dr. Michael Stanton-Hicks; (2) Dr. Michael J. Kushner; (3) Dr. Mark F. Hendrickson; and (4) Dr. George S. Edwards, Jr.
6. The issues to be determined from this hearing are as follows:
(a) Whether plaintiff suffered a compensable occupational disease during her employment with defendant-employer?
(b) If so, what, if any workers' compensation benefits is plaintiff entitled?
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 39 years old as of the date of the hearing before the Deputy Commissioner. Plaintiff was hired as a pathologist assistant by Eastern Carolina Pathology in late 1993.
2. Eastern Carolina Pathology performs mostly small pathological evaluations with specimens only weighing a few ounces.
3. The job duties of pathologist assistant are documented by the videotape and physical demands analysis stipulated into evidence by the parties. The physical demands analysis and videotape are accurate depictions of plaintiff's job duties.
4. Plaintiff's job duties were not strenuous or repetitive. Plaintiff's job duties involved varied tasks and plaintiff did not perform the same activity over and over on a continuous basis throughout the day.
5. Plaintiff actually performed examinations of specimens during approximately 20 hours per week. Plaintiff spent approximately one hour of the 20 performing gastrointestinal biopsies, which only required plaintiff to dictate into a microphone. Plaintiff spent the remainder of her hours performing quality control work or paperwork.
6. Plaintiff averaged 55 cases per day during January of 1999 and created approximately 120 tissue cassettes per day. It was common for plaintiff to prepare one tissue cassette per specimen and to make only one slice per specimen. Plaintiff's scalpel was sharp and plaintiff would sharpen it if need be.
7. Plaintiff did not rest her arms on anything while working. Plaintiff's job duties involved extension and flexion to approximately 90 degrees. Plaintiff's job duties did not involve continuous flexion for hours on end at greater than 90 degrees of the arms. Plaintiff's height allowed plaintiff to work with her arms somewhat extended and less flexed than did Dr. Cash as depicted in the videotape.
8. During the spring of 1999, and prior to her surgery, plaintiff stated while interacting with individuals in the histology lab that she had injured her right arm when one of her children struck or landed on her elbow. Plaintiff stated that she was going to need surgery to repair her injury or condition.
9. In January of 1999, plaintiff first experienced symptoms of ulnar neuropathy after lifting her son out of a highchair, placing her son on the floor, placing her son in the car, and driving the car to daycare prior to going to work.
10. Plaintiff's symptoms were no worse while working than they were when plaintiff was not working. Plaintiff's ability to perform her job was not affected by her condition except during the period she was out of work following her surgery. Dr. Vanden Bosch performed right ulnar nerve transposition on Mary 24, 1999.
11. Following her surgery, plaintiff returned to work and was able to perform her job without difficulty. Plaintiff told her superior, Dr. Cash, she wanted to work because her symptoms were no worse at work than they were at home.
12. Plaintiff testified that her job duties were no more strenuous than "normal living".
13. Plaintiff continued working until December of 1999. Plaintiff had hired an attorney to evaluate the possibility of suing Dr. Vanden Bosch for medical malpractice. This attorney advised plaintiff not to sue Dr. Vanden Bosch but suggested to plaintiff that she file a workers' compensation claim.
14. Plaintiff did file a Form 18 on March 1, 2000. Prior to plaintiff's filing of the Form 18, Eastern Carolina Pathology was unaware that plaintiff alleged that her condition was related to her job duties.
15. Dr. George Edwards, Jr. of the Raleigh Hand Center testified after reviewing an accurate physical demands analysis and videotape of plaintiff's job duties. Dr. Edwards testified that ulnar neuropathy was not peculiar to plaintiff's profession as a pathologist assistant, that plaintiff was not at an increased risk of developing ulnar neuropathy as compared to a member of the general public not working as a pathologist assistant, and that plaintiff's job duties as a pathologist assistant did not significantly contribute to plaintiff's development of ulnar neuropathy. Dr. Edwards explained in clear concise terms the physiology of ulnar neuropathy and the compression of the ulnar nerve, and how ulnar neuropathy can develop physiologically. Dr. Edwards provided literature in conjunction with his deposition that supports his opinion regarding ulnar neuropathy and acute flexion at the elbows. Dr. Edwards is the only physician to support his opinion with literature. The undersigned gives Dr. Edwards' opinion considerable weight in this matter.
16. Dr. Michael J. Kushner of Wilson Orthopaedic Neurology Center testified that plaintiff was at an increased risk of developing carpel tunnel syndrome, and that plaintiff's job duties significantly contributed to her development of carpal tunnel syndrome. However, Dr. Kushner further testified that all this testimony was speculation because he knew very little about plaintiff's job duties. He testified that plaintiff's condition was not peculiar to the occupation of pathologist assistant. Dr. Kushner assumed that plaintiff performed autopsies and worked a lot of overtime. Dr. Kushner was unable to state how ulnar nerve compression could result physiologically from plaintiff's job duties. Dr. Kushner testified that plaintiff's job duties were repetitive and strenuous. He compared plaintiff's job duties to those performed by tire builders, assemblers, jackhammer workers, and seamstresses at the Wrangler facility. Dr. Kushner was unable to identify any literature that supported his opinion. The undersigned gives little weight to Dr. Kushner's testimony.
17. Dr. Stanton-Hicks testified by telephone from his offices in Cleveland, Ohio at the Cleveland Clinic. Dr. Stanton-Hicks is Vice Chair of the Division of Anesthesia for Pain Research and Pain Management at the Cleveland Clinic Foundation in Cleveland, Ohio. Dr. Stanton-Hicks is board certified in anesthesiology and pain medicine and he focuses his treatment of RSD or complex regional pain syndrome. Dr. Stanton-Hicks has not reviewed the physical demands analysis and videotape prior to his testimony. Dr. Stanton-Hicks testified that plaintiff's condition was related to her employment because plaintiff was required to perform repetitive fine movements of the hands while holding her arms and hands in the same position for 15 to 20 minutes. Dr. Stanton-Hicks testified that plaintiff's holding of the scalpel for the entire time that she worked while going from one specimen to another was the cause of plaintiff's ulnar neuropathy. Dr. Stanton-Hicks' testimony is not supported by the evidence, as the evidence indicates that plaintiff in fact usually was not holding the scalpel while performing varied tasks. Dr. Stanton-Hicks is unfamiliar with plaintiff's job duties and any opinions that he has rendered regarding causation are nothing more than mere speculation. Dr. Stanton-Hicks did not provide any literature to support his opinion. The undersigned gives little weight to Dr. Stanton-Hicks' testimony.
18. Dr. Mark F. Hendrickson also testified by telephone deposition from the Cleveland Clinic in Cleveland, Ohio. Dr. Hendrickson is Chief of the section of Hand Surgery at the Cleveland Clinic in Cleveland, Ohio in the Department of Plastic Reconstructive Surgery. He is board certified in general surgery and plastic and reconstructive surgery. He does not have a specialty in hand surgery. He is not board certified in hand surgery. His practice mainly centers around the placement of peripheral nerve stimulators and complex regional pain syndrome/RSD cases.
19. Dr. Hendrickson testified that plaintiff's ulnar neuropathy was related to her job duties based on the fact that plaintiff performed what Dr. Hendrickson considered to be an extraordinary number of pathology cases in a short period of time. Dr. Hendrickson was however unable to explain what it was about the number of cases that plaintiff performed that was extraordinary. Dr. Hendrickson was unable to explain how plaintiff's condition resulted from a physiological standpoint, and what job duties plaintiff performed caused ulnar nerve compression. Dr. Hendrickson was non-responsive and refused to respond to hypotheticals presented by defense counsel. Dr. Hendrickson did not provide any literature to support his opinion. Dr. Hendrickson compared plaintiff's job duties to the job duties performed by a Maryland eastern shore chicken processor. The undersigned gives Dr. Hendrickson's opinion little weight.
20. Plaintiff has undergone numerous surgeries and continues to treat for her ulnar neuropathy and chronic regional pain syndrome/RSD at the present date.
21. Plaintiff was paid her full salary until the end of 1999 at which time she began receiving short-term disability benefits through two monthly checks of $923.50. On July 2, 2000, plaintiff began receiving long-term disability benefits of $2,732.00 per month. Eastern Carolina Pathology paid all premiums related to plaintiff's disability insurance. Defendants would be entitled to a credit for all disability benefits and salary paid should plaintiff's claim be compensable.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. A plaintiff seeking compensation for an occupational disease under N.C. Gen. Stat. § 97-5(13) must establish that his disease or condition meets the following three criteria: (1) the condition is "characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged"; (2) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation"; and (3) there is "a causal connection between the disease and the [claimant's] employment." Rutledge v. Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359,365 (1983) (citations omitted). The first two elements of the three-prong test are satisfied where the plaintiff can show that "the employment exposed [him] to a greater risk of contracting the disease than the public generally." Id. at 94, 301 S.E.2d at 365.
2. Plaintiff's job duties did not expose plaintiff to a greater risk of contracting ulnar neuropathy than the public generally.
3. Plaintiff's job duties did not significantly contribute to the development of plaintiff's ulnar neuropathy.
4. Ulnar neuropathy is not a condition peculiar to the occupation of pathologist assistant.
5. Plaintiff does not suffer from an occupational disease, as plaintiff's ulnar neuropathy is not causally related to plaintiff's job duties as a pathologist assistant.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
Plaintiff's occupational disease claim of May 20, 1999 is hereby DENIED.
This the 18th day of November 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DCS/mb